## THE POPE CATLIN.

UNITED STATES *v.* THE POPE CATLIN, her Engines, Boilers, etc.

*(District Court, S. D. Georgia, E. D. May 21, 1887.)*

1. EVIDENCE—BURDEN OF PROOF—PENAL ACTION—NAVIGATION LAWS.
   In proceedings to recover a penalty for violations of the navigation laws, the burden of proof is on the prosecution.

2. STEAM-SHIPS—NECESSITY OF PERMIT—EXCURSION.
   Under section 4466 of the Revised Statutes, where a passenger steamer does not carry, or purpose to carry, a number of passengers additional to the number authorized by its certificate, and does not go or purpose to go out of the waters where it is authorized by its certificate to ply, it is not an "excursion," in the meaning of the statute, and no special permit in writing is necessary.

3. ADMIRALTY—PLEADING—PENALTY.
   When a penalty is demanded against a steam-vessel upon grounds not set out in the libel, the demand will be ignored.

4. SAME—EVIDENCE CONSIDERED.
> The evidence in this case is unsatisfactory and contradictory, and the court will not adjudge the vessel liable, and the libel is dismissed.

(*Syllabus by the Court.*)

Libel *in rem*. Seizure.
*Du Pont Guerry*, U. S. Atty., for the United States.
*Garrard & Meldrim*, for defendant.

SPEER, J. This is a libel brought by the United States district attorney against the steamer Pope Catlin, asking that said steamer be adjudged liable for certain penalties, which have, he alleges, been incurred by the violation of certain sections of the Revised Statutes, relating to the equipment and navigation of steam-vessels.

The nature of the case is of a *quasi* criminal character, it having been brought to recover a penalty. In such cases the burden of the proof is on the prosecution.

It is first insisted that there was a violation of section 4466 of the Revised Statutes. That statute provides that, "if any passenger steamer engages in excursions, the inspectors shall issue to such steamer a special permit in writing for the occasion, in which shall be stated the additional number of passengers that may be carried, and the number and kind of life-saving appliances that shall be provided for the safety of such additional passengers; and they shall also, in their discretion, limit the route and distance for such excursions." It is said that the master of the Pope Catlin made this excursion without applying for the permit. It does not appear that the excursion was outside of the district of Savannah, in the waters of which the vessel, by its certificate, was permitted to ply, nor does it appear that it was purposed at that time to carry an additional number of passengers, in excess of the number which the vessel was habitually and regularly entitled to carry, or that an additional number were carried. The object of the statute is twofold—*First*, to prevent overcrowding the steamer; *second*, to prevent a hazardous excursion in dangerous waters. Here neither of these contingencies could occur.

The testimony is uncontradicted that but 283 tickets were sold, when she was permitted to carry 400 passengers; and that it was intended to steam down the south channel of the river, through Lazaretto creek and back, via Thunderbolt and St. Augustine creek, the usual route for such excursions in land-locked waters, and within which the steamer by its certificate was already permitted to navigate. Under the construction which the court places upon the statute, no permit was necessary, and, not being necessary, there could be no violation of law in going without it. This is not only the construction of the court, but it is the construction of the chief inspectors, whose duty it is to prepare the forms of these permits. The blank permit in evidence, for excursions, is in the following words:

"(Form 2149.)

"PERMIT TO CARRY EXCURSION PARTY.

"(To be surrendered when required by inspectors in the district in which this permit is used.)

"OFFICE OF U. S. LOCAL INSPECTORS OF STEAM-VESSELS,

"———— District, at ————.

"————, 188—

"The steamer ————, of ————, whereof ———— is master, having been provided with ———— boats, ———— buckets, ———— floats, ———— barrels, ———— axes, and ———— life-preservers, in addition to the number required by her certificate of inspection, and other sufficient arrangements having been made, necessary for the safety of the lives of passengers on board in case of accident, is hereby allowed to carry (in addition to the number allowed by said certificate) an excursion party consisting of not more than ———— persons, from ———— to ————, a distance of ———— miles and return, on the ———— day of ————, 188—, in accordance with the terms of section 4466 of the Revised Statutes of the United States.

"————————

"————————

"U. S. Local Inspectors of Steam-Vessels."

Where these blanks have been used by local inspectors here, the words, "in addition," and the words, "in addition to the number allowed" by said certificate, are stricken out, in order to make the certificate conform to the local construction of the statute; which erasure is not warranted.

Again, the Pope Catlin is said to have violated section 4488 of the Revised Statutes, in that there was no suitable boat-disengaging apparatus, it being insisted that she was a steamer navigating a sound of the United States. While the district attorney introduced evidence with reference to this ground, and insisted upon it in the argument, an examination of the libel discloses the fact that no sort of reference was made to it in its averments, and for this reason it must be ignored.

With regard to the alleged insufficiency of life-boats, the court is not satisfied from the evidence that such insufficiency existed. The evidence is conflicting. The testimony of one of the inspectors being that there were dents in the bottom of the boat, and no holes; that it was otherwise sound; and the other inspector, that there were holes or a hole. This evidence is very unsatisfactory. The master testifies that the boat was in good order. The testimony of the inspectors being contradictory, the court feels bound, under the circumstances, to accept the testimony of the master. With regard to the alleged failure to have a sufficient number of life-preservers, the case made by the government is stronger upon that feature than upon any other; but, in the opinion of the court, the evidence is not of that clear and satisfactory character that would justify the imposition of the severe and harsh penalty fixed by this statute upon the master and owner of this vessel.

The statute is:

"Every such steam-vessel carrying passengers shall also be provided with a good life-preserver, made of suitable material, for every cabin passenger

for which she will have accommodation; and also a good life-preserver or float for each deck or other class passenger which the inspector's certificate shall allow her to carry, including the officers and crew; which life-preservers or floats shall be kept in convenient and accessible places on such vessel, in readiness for immediate use in case of accident."

It will be observed there is no evidence in regard to the vessel's equipment on the day of the excursion, except the testimony of a Mr. Solomon, who said he looked around, and did not see any life-preservers. The inspectors saw the vessel a day or two afterwards, and they say that 66 life-preservers were not in good order; that 167 were in good order. They do not say that these life-preservers, which they considered were not in good order, were absolutely worthless. The evidence does not indicate how many were only partially serviceable; how many were altogether unserviceable. The inspectors condemn 66, and say they should have been repaired, and they were repaired at once. The master testifies that all the life-preservers were in a serviceable condition. The sailmaker, who repaired the life-preservers, testified that he had much experience with them, and some of those the inspectors condemned were more serviceable than others they approved. He also testified that the class of life-preservers was unusually good,—the "best he ever saw." Then the evidence is, further, that the inspectors did not observe certain life-preservers that were in the ladies' saloon, and they did not notice the floats at all. The evidence on this ground is likewise quite contradictory.

With regard to the testimony of the pilot, the court prefers, under all the circumstances, to believe the master rather than the pilot, he being contradicted by the master. It is not necessary to give the reasons, but the court is unwilling to base any judicial action upon this person's testimony, considering all he said, the manner of his saying it, and comparing it with the manner and testimony of the master to the contrary.

Generally, I will say about this case that, if the inspectors had complied with their duty under section 21 of the statutes, there would have been apparently no necessity for this prosecution. It was their duty, when they first inspected this vessel, before they officially gave the certificate, to have inspected the whole equipment, and to have given the master notice in writing that his equipment was not in their judgment in accordance with the law, if they found it unsatisfactory. As soon as they notified the master what repairs they deemed proper, he made them, and his whole conduct evidences a willingness and readiness to comply with their requirements. The court is satisfied that Mr. Headman, one of the inspectors, did not treat the master with the respect due to him. When an inspector boards a vessel to inspect it, he should certainly recognize the master as in command, and thus he will have a much better opportunity to ascertain the real equipment. In this case they saw the master, and walked by him, without the courtesy of a salutation, and consulted with a subordinate, the colored pilot, to whose testimony I have just referred. Under these circumstances, the court will not be curious to find trifling defects of equipment, especially when the inspectors may be mistaken in their facts, when they could have

been absolutely correct if they had consulted with and requested or demanded the master to point out the equipments on board the vessel.

These laws are to be enforced in a spirit of liberality and decency towards the masters of steam-vessels. Inspectors are not appointed to entrap the master and owner of a vessel, but they are to give him a fair showing, and call on him to point out the equipment, in order that there may be a just determination whether the boat is in a suitable condition to protect the life and afford safety to passengers, and, if it is wrong or insufficient, to give him an opportunity of correcting it. That was not done in this case, and it seems, from the testimony of the captain, and it is pretty clear from the testimony of at least one of the inspectors, that one of these inspectors had personal prejudice towards this master. He states he was told to watch the master closely when the latter came here from the north. This inspector detects what is manifestly an innocent and an accidental erasure, in an unimportant part of the master's certificate, and attaches culpability on the part of the master with regard to that erasure, extending it to an imputation of forgery. He makes four inspections of the Pope Catlin, in a very short time, when it appears that he has not inspected, or attempted to inspect, any one of several other steam-vessels plying in this harbor; and altogether I do not think in this case the master of the Pope Catlin has had a fair examination, or fair treatment. I am uncertain, from the evidence in this case, whether these life-preservers were in accordance with the law. There must have been some deficiency in them, but to what extent the evidence is not sufficiently clear. Taken altogether, and considering its contradictions and the unshaken denials of the master, it is insufficient to justify the court in imposing the penalties and condemning the vessel.

For these reasons it is adjudged that the libel be dismissed, at the cost of the United States.